UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

MARY J. HOUSTON,                      )
                                      )
            Plaintiff,                )
                                      )
        v.                            ) No. 2:11CV50 ERW
                                      )              (FRB)
MICHAEL J. ASTRUE, Commissioner       )
of Social Security,                   )
                                      )
            Defendant.                )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

        This cause is before the Court on appeal of an adverse
ruling of the Social Security Administration.  All pretrial matters
were referred to the undersigned United States Magistrate Judge
pursuant to 28 U.S.C. § 636(b) for appropriate disposition.

**I.  Procedural History**

        On January 15, 2009, plaintiff Mary J. Houston filed an
application for Disability Insurance Benefits pursuant to Title II,
42 U.S.C. §§ 401, et seq., in which she claimed she became disabled
on June 15, 2000.  (Tr. 99-105.)  Plaintiff subsequently amended
the onset date of disability to October 1, 2008.  (Tr. 97.)  On
initial consideration, the Social Security Administration denied
plaintiff's claim for benefits.  (Tr. 51-52, 55-60.)  On September
10, 2009, a hearing was held before an Administrative Law Judge
(ALJ) at which plaintiff testified.  A vocational expert also
testified at the hearing.  (Tr. 26-50.)  On August 10, 2010, the

ALJ issued a decision denying plaintiff's claim for benefits. (Tr. 10-22.) On May 26, 2011, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-5.) The ALJ's decision is thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

A. <u>Plaintiff's Testimony</u>

At the hearing on September 10, 2009, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff lived in a house with her two children, ages fifteen and seventeen. Plaintiff completed eleventh grade in high school and has had no other formal training or education. Plaintiff is right-handed. (Tr. 30-31.)

In her Work History Report, plaintiff reported that she worked in the past as a janitor, in fast food, and as a nurse's aide. (Tr. 141.) Plaintiff testified that she worked as a nurse's aide for a health and rehabilitation facility in 2000 and 2001 but left that job because it was too far from where she lived. Plaintiff testified that she worked for Kelly Services for three or four months in 2001 but left that job after breaking her back in a car accident. (Tr. 33-35.) Plaintiff testified that she worked as a babysitter for four months in 2003 and also worked at Casey's General Store. Plaintiff testified that she stopped working at Casey's because of the stress involved. Plaintiff testified that

she also worked for five or six months at All Parts, Inc., but that her health problems caused pain during such work. (Tr. 32-33.) Plaintiff testified that she last worked in 2004 for four months boxing hangers at a plastics company. Plaintiff testified that she had a heart attack and could not return to work after stents were placed. (Tr. 31-32.)

Plaintiff testified that she cannot work because she cannot raise her right arm, cannot bend as she used to, has swelling in her knees, has sharp pains in her legs and back, experiences pain "like it's tearing the top of [her] back," and has difficulty with her memory. (Tr. 41.) Plaintiff testified that she experiences constant pain in her right hand and that her hand becomes numb two or three times a day for up to fifteen minutes. Plaintiff testified that such sensations can occur spontaneously or with activity such as writing. (Tr. 41-42.)

Plaintiff testified that she also experiences depression which causes her to feel irritable and to have crying spells. Plaintiff testified that she does not like to leave the house very often. Plaintiff testified that she takes Buspirone for the condition as prescribed by her general physician. Plaintiff testified that she has taken medication for depression on and off for several years. (Tr. 42-43.)

Plaintiff testified that she takes insulin, Atenolol, thyroid medication, Lovastatin, and a water pill for her

conditions.  (Tr. 40.)  Plaintiff testified that she measures her blood sugar level with strips when she has them.  Plaintiff testified that she does not always have the strips because she does not have insurance and the strips are expensive.  (Tr. 41.) Plaintiff testified that she also takes Tramadol for pain but that she nevertheless continues to experience pain.  Plaintiff testified that the medication also makes her sleepy.  (Tr. 40, 44.)

As to her exertional abilities, plaintiff testified that she sometimes needs help with undressing and with personal hygiene. (Tr. 35.)  Plaintiff testified that she can lift a gallon of milk with her left hand, but cannot lift a case of soda.  Plaintiff testified that she can sit for approximately one-half hour before feeling stiff and needing to stand.  Plaintiff testified that she must elevate her legs while she sits.  Plaintiff testified that she can stand for fifteen minutes before she starts to feel a stabbing pain in her legs.  Plaintiff testified that walking is easier than standing and that she can walk for fifteen minutes.  (Tr. 36-37.) Plaintiff testified that she has difficulty going up and down stairs and that she must go slowly and use a handrail.  Plaintiff testified that she can squat to pick things up from the floor. Plaintiff testified that she can reach out and overhead with her left hand but not with her right.  Plaintiff testified that she has trouble writing with her right hand.  (Tr. 37-38.)  Plaintiff testified that she can hold a knife and fork in her right hand, but

that she has learned to eat with her left hand. Plaintiff testified that she has difficulty holding anything with her right hand when her hand is numb. (Tr. 39.)

As to her daily activities, plaintiff testified that she lies down for most of the day due to pain and lack of motivation. Plaintiff testified that she naps for two hours, three or four days a week. (Tr. 43-44.) Plaintiff testified that she is able to cook, but does so in pain. (Tr. 35.) Plaintiff testified that she uses recipes while cooking but sometimes has trouble following the recipe and will miss adding ingredients. (Tr. 40.) Plaintiff testified that her children primarily do the dishes and the vacuuming and that they help with the laundry. (Tr. 35.) Plaintiff testified that she does the grocery shopping but that her children go with her. (Tr. 36.) Plaintiff testified that she has difficulty remembering what she needs at the store and must constantly refer to a list. (Tr. 39.) Plaintiff testified that she has no hobbies, does not attend church, and engages in no social events. Plaintiff testified that she reads newspapers but has difficulty understanding what she reads. (Tr. 36.) Plaintiff testified that she can drive but can only use her left hand. (Tr. 35.)

B.  Testimony of Vocational Expert

Michelle Peters, a vocational expert, testified in response to questions posed by the ALJ and counsel.

Ms. Peters classified plaintiff's past work as a shipping clerk as medium and unskilled. Ms. Peters classified plaintiff's past work as a general laborer with Kelly Services to be medium and advanced skilled. Ms. Peters classified plaintiff's past work as a nurse's aide as medium and low to semi-skilled. (Tr. 45-46.)

The ALJ asked Ms. Peters to assume an individual of plaintiff's age, education, work experience, and skill set and to further assume that such a person was "limited to light work that did not require climbing of ladders; and only occasional postural activities such as climbing, crawling, crouching, stooping, and kneeling; and only occasional reaching overhead; and avoiding concentrated exposure to vibration[.]" (Tr. 46.) Ms. Peters testified that such a person could not perform any of plaintiff's past work, but could perform work as a cashier, of which 84,000 such jobs existed in the State of Missouri. Ms. Peters testified that such a person could also perform work in an assembly-type position, of which 7,500 such positions existed; and in hand packaging, of which approximately 13,000 such jobs existed. (Tr. 46-47.)

The ALJ then asked Ms. Peters to assume the same individual, but that the individual could engage in only occasional handling or fingering with the right dominant hand. Ms. Peters testified that such an additional limitation would preclude the performance of the previously-listed jobs. (Tr. 47.)

Ms. Peters was then asked to assume the same individual as set out in the first hypothetical, but that the person could engage with coworkers and the public only occasionally. Ms. Peters testified that such a person could not perform work in the cashiering positions inasmuch as such work would require constant contact with the public. Ms. Peters testified that with this additional limitation, only 6,500 positions as an assembly worker would be available and only 11,500 positions as a hand packager would be available. Ms. Peters testified that such a person could also perform work as an inspector, of which 8,500 positions exist. (Tr. 47-48.)

### III.  Medical Records

Plaintiff visited Pike Medical Clinic on August 10, 2001. It was noted that plaintiff's medical history included insulin dependent diabetes mellitus and depression. (Tr. 204-05.) On August 30, 2001, it was noted that plaintiff had a possible pelvic fracture. (Tr. 209.)

On October 1, 2001, plaintiff reported to Pike Medical Clinic that Vicodin[1] was not helping. Percodan[2] was prescribed. On October 25, 2001, plaintiff reported that her back was much

---

[1]Vicodin is used to relieve moderate to severe pain. Medline Plus (last revised July 18, 2011)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a601006.html>.

[2]Percodan is used to relieve moderate to severe pain. Medline Plus (last revised Oct. 15, 2011)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a682132.html>.

better and that she was not taking much pain medication.  (Tr. 210-11.)

During a work physical at Pike Medical Clinic on March 13, 2002, it was noted that plaintiff's diabetes was uncontrolled. Follow up for better control was recommended.  (Tr. 223-24.)

Plaintiff returned to Pike Medical Clinic on November 23, 2003, and complained of back pain and high blood sugar levels. Medication was prescribed.  (Tr. 227.)  On December 1, 2003, plaintiff complained of back pain and head pain.  Plaintiff reported having no change in her pain condition since the last visit.  Plaintiff was instructed to increase her insulin. Additional medication was prescribed, including Lexapro.[3]  (Tr. 229.)

Plaintiff visited Pike Medical Clinic on December 29, 2003, with complaints of symptoms relating to bronchitis, including headaches.  Depo-Medrol[4] was prescribed.  (Tr. 231.)

Results from an ECG dated February 2, 2004, showed poor R wave progression in the precordial leads.  The ECG was considered to be borderline.  (Tr. 232-33.)

Plaintiff returned to Pike Medical Clinic on February 4,

---

[3]Lexapro is used to treat depression and generalized anxiety disorder.  Medline Plus (last revised Apr. 13, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603005.html>.

[4]Depo-Medrol is a corticosteroid used to relieve inflammation. Medline Plus (last reviewed Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601157.html>.

2004.  Plaintiff was diagnosed with insulin dependent diabetes mellitus and generalize anxiety disorder.  Xanax[5] and Zoloft[6] were prescribed.  (Tr. 234.)

On February 24, 2004, plaintiff complained to Pike Medical Clinic that she had chest pain radiating to her lower arms and hands.  Plaintiff reported experiencing such pain with activity within the previous several weeks, and that the episodes of such pain lasted less than five minutes.  Plaintiff's medications were noted to include insulin, Zoloft, Warfarin,[7] and Xanax.  It was noted that plaintiff had no condition warranting the use of Warfarin.  It was determined, therefore, for plaintiff to discontinue the medication.  Plaintiff was instructed to take aspirin daily.  Physical examination was unremarkable.  An EKG did not reveal Q waves or ST segment changes.  A cardiac consultation was ordered.  Plaintiff was instructed to limit her activity and to

---

[5]Xanax is used to treat anxiety disorders and panic disorder. Medline Plus (last revised Nov. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684001.html>.

[6]Zoloft is used to treat depression, obsessive-compulsive disorder, panic attacks, and social anxiety disorder. Medline Plus (last revised Apr. 13, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html>.

[7]Warfarin (Coumadin) is used to prevent blood clots from forming or growing larger in the blood and blood vessels.  It is prescribed for people with certain types of irregular heartbeat and people who have suffered a heart attack.  Medline Plus (last reviewed Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682277.html>.

not strain her heart in any way.  (Tr. 238, 242.)

An echocardiogram performed on March 8, 2004, was essentially unremarkable.  Trace tricuspid regurgitation was noted. (Tr. 243.)

Plaintiff returned to Pike Medical Clinic on July 12, 2004, and reported having no chest pain.  It was noted that plaintiff had missed her cardio appointment and had forgotten to take her Plavix.[8]  The importance of taking her medication was discussed with plaintiff.  (Tr. 244.)

On July 27, 2004, plaintiff reported to Pike Medical Clinic that she was having pain in her back and that it felt like pins and needles.  Plaintiff requested that she be prescribed an antidepressant.  Plaintiff was prescribed Effexor.[9]  Plaintiff was also prescribed Neurontin[10] for her symptoms of neuropathy.  (Tr. 247.)

Plaintiff returned to Pike Medical Clinic on September 2, 2004, and reported no new complaints.  Dr. Kevin Martin noted

---

[8]Plavix is used to prevent strokes and heart attacks in patients at risk for these problems. Medline Plus (last reviewed Nov. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601040.html>.

[9]Effexor is used to treat depression, generalized anxiety disorder, social anxiety disorder, and panic disorder. Medline Plus (last revised Jan. 15, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694020.html>.

[10]Neurontin is used to relieve the pain of postherpetic neuralgia. Medline Plus (last revised July 15, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html>.

plaintiff's diabetes not to be controlled. Plaintiff was instructed as to proper use and dosage of her medication. (Tr. 250.)

On February 7, 2005, plaintiff complained to Pike Medical Clinic of having edema in both legs. Plaintiff reported that she "hurt all over" and that she was depressed. Dr. Martin diagnosed plaintiff with peripheral edema, polyarthralgia and diabetes mellitus I and ordered laboratory testing. Cymbalta[11] was prescribed for depression. (Tr. 255.) Laboratory results showed abnormal thyroid, which Dr. Martin opined could explain plaintiff's fatigue. Synthroid[12] was prescribed. (Tr. 258.)

Plaintiff returned to Pike Medical Clinic on April 14, 2005, and complained of low back pain. Plaintiff's medications were noted to include Plavix, Levothroid, Cymbalta, aspirin, Atenolol,[13] Lovastatin,[14] and insulin. Dr. Martin noted plaintiff's

---

[11]Cymbalta is used to treat depression and generalized anxiety disorder, and also to treat pain and tingling caused by diabetic neuropathy as well as ongoing bone or muscle pain. _Medline Plus_ (last revised Jan. 15, 2012)<http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a604030.html>.

[12]Synthroid (Levothyroxine, Levothroid) is used to treat hypothyroidism. _Medline Plus_ (last reviewed Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682461.ht ml>.

[13]Atenolol is used to treat high blood pressure. _Medline Plus_ (last revised July 1, 2010)<http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a684031.html>.

[14]Lovastatin is used to help reduce the risk of heart attack and stroke. _Medline Plus_ (last revised June 15, 2012) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a688006.html>.

diabetes to be uncontrolled.  Plaintiff was instructed to continue with her current medications.  Physical therapy was prescribed for plaintiff's back pain.  (Tr. 260.)

Plaintiff was admitted to the emergency room at Pike County Memorial Hospital on October 10, 2006, after having been involved in a motor vehicle accident.  Plaintiff complained of right-sided back pain.  Bruising was noted.  Plaintiff had good movement and sensation in all extremities.  X-rays of the ribs were normal.  Plaintiff was discharged that same date and diagnosed with strain/contusion of the right ribs, low back and right hip.  (Tr. 276-81.)

Plaintiff was readmitted to the emergency room on October 18, 2006, complaining of worsening pain in her back on the right side.  Plaintiff was given medication, including Toradol,[15] Norflex[16] and Dilaudid.[17]  Plaintiff was treated and discharged that same date.  Plaintiff was prescribed Naproxen[18] upon discharge and was

---

[15]Toradol is used for the short-term relief of moderately severe pain.  Medline Plus (last revised Oct. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693001.html>.

[16]Norflex is used to help relieve pain and discomfort caused by strains, sprains and other muscle injuries.  Medline Plus (last revised Dec. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682162.html>.

[17]Dilaudid injections are used to relieve pain.  Medline Plus (last reviewed Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601148.html>.

[18]Naproxen is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis, and ankylosing spondylitis.  Naproxen is also used to relieve shoulder

instructed to take Vicodin as needed for pain.  (Tr. 282-85.)

Plaintiff was admitted to the emergency room at Pike County Memorial Hospital on February 19, 2007, for acute exacerbation of bronchial asthma.  Plaintiff was admitted to the hospital.  Chest x-rays showed no evidence of active pulmonary disease.  It was noted that plaintiff's diabetes was poorly controlled and plaintiff admitted that she did not watch her diet closely.  Plaintiff's history of coronary artery disease was noted.  Plaintiff was instructed as to outpatient cardiac therapy.  Plaintiff was discharged on February 22, 2007, with diagnoses of acute exacerbation of bronchial asthma, diabetes mellitus, chronic obstructive lung disease, and nicotine addiction.  (Tr. 287-31.)

Plaintiff visited Pike Medical Clinic on March 15, 2007, for follow up of pneumonia.  It was noted that plaintiff recently underwent placement of vessel stents for arteriosclerotic vascular disease of the heart.  Plaintiff denied any current chest discomfort.  ENT examination was negative.  It was noted that plaintiff would continue with DuoNeb therapy.  (Tr. 262-63.)

Plaintiff returned to Pike Medical Clinic on June 20, 2007, for medication refills.  It was noted that plaintiff's current medications included Atenolol, Lovastatin, Levothyroxine, Plavix, and insulin.  No new complaints were noted.  (Tr. 264.)

_____

pain caused by bursitis, tendinitis, gouty arthritis, and pain from other causes.  Medline Plus (last revised June 15, 2012) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html>.

Plaintiff returned to Pike Medical Clinic on April 18, 2008, for medication refills.  Plaintiff reported that she had been taking her medications and felt relatively well.  It was noted that plaintiff's medications included Plavix, Levothyroxine, Lovastatin, and Atenolol.  Plaintiff's cardiovascular status was noted to be stable.  Plaintiff reported having no chest pain or discomfort.  No evidence of diabetic peripheral neuropathy was noted.  Plaintiff was instructed to follow up in eight weeks.  (Tr. 266.)

Plaintiff visited Pike Medical Clinic on June 17, 2008, and reported having sensations of heaviness in her legs.  Increased edema was noted.  The possibility of advancement of the diabetes condition was noted.  Cardiovascular status was noted to be stable.  Plaintiff was instructed to continue with her insulin therapy.  Referral to a diabetic specialist was discussed, but plaintiff cited financial reasons for her reluctance to proceed.  Plaintiff was instructed to return in one month.  (Tr. 268-69.)  On July 17, 2008, it was noted that plaintiff's legs were swollen.  Lisinopril[19] was added to plaintiff's medication regimen.  (Tr. 272.)

Plaintiff returned to Pike Medical Clinic on September 18, 2008, and reported having weakness and fatigue.  It was noted that plaintiff's diabetes was poorly controlled and that she was borderline with chronic obstructive lung disease.  Plaintiff

---

[19]Lisinopril is used to treat high blood pressure.  Medline Plus (last reviewed Feb. 1, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692051.html>.

reported not regularly checking her blood sugar level because of the expense involved. Plaintiff also reported having difficulty with dietary compliance because of her financial situation. Plaintiff was encouraged to quit smoking. Plaintiff's medications were refilled and she was instructed to return in two months. (Tr. 273.)

On October 1, 2008, plaintiff reported to Pike Medical Clinic that she had pain in her right arm. It was questioned whether plaintiff had ulnar nerve entrapment. Celebrex[20] and Darvocet[21] were prescribed. Plaintiff's arm was placed in a sling, which provided relief. (Tr. 274.)

On March 10, 2009, plaintiff underwent a consultative examination for disability determinations. Plaintiff complained of experiencing pain in her right shoulder for two years. Plaintiff reported that she takes pain medication for the condition but that the medication did not help. Plaintiff reported that she cannot drive with her right hand on account of the condition, that she cannot raise her right arm, and that her fingers go numb. Plaintiff also complained of experiencing constant back pain

---

[20]Celebrex is used to relieve pain, tenderness, swelling and stiffness caused by osteoarthritis, rheumatoid arthritis and ankylosing spondylitis, as well as pain from other causes. Medline Plus (last reviewed Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699022.html>.

[21]Darvocet is used to treat mild to moderate pain. Medline Plus (last revised Mar. 16, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601008.html>.

resulting from motor vehicle accidents in 1978 and 2001. Plaintiff reported exacerbation of such pain when she picks up things or when she is sitting. It was noted that plaintiff never had MRI testing of either the shoulder or back. Plaintiff also complained of swelling and having needle-like pain in her legs. Plaintiff reported having steel plates in her right thigh region from one of the accidents. Plaintiff reported that she has difficulty bending because of the swelling in her legs. Plaintiff also complained of diabetes mellitus and that her blood sugar level was uncontrolled. Plaintiff reported that she checked her level infrequently. Finally, plaintiff reported her history of heart problems, including suffering a "light" heart attack and having had three stents placed. Plaintiff reported current shortness of breath, chest pain, and having heart palpitations. Physical examination showed pitting edema of the lower extremities, prominent up and around the knee region. Plaintiff had decreased range of motion in flexion of the knees due to swelling. Plaintiff had slightly limited range of motion about the cervical and lumbar spine, as well as about the right shoulder with adduction on the right measured at twenty degrees. Plaintiff had full grip strength on both the right and left sides. Upper extremity strength was 5/5 on the left and 4/5 on the right. Plaintiff could heel and toe walk but walked slowly with a slight limp. Pain was noted about the hips with external rotation. Mild tenderness was noted with firm

pressure about the back, especially the upper thoracic spine; and mild evidence of muscle spasm was noted about the paravertebral musculature. No sensory loss was noted. Difficulty with squatting and bending at the waist was noted. Deep tendon reflexes were +1 at the knees. No sign of unilateral atrophy was noted. Dr. Gary W. Rucker opined that plaintiff had back pain and hip pain due to osteoarthritis and trauma and fracture related to motor vehicle accident. Dr. Rucker opined that plaintiff's back pain was also due to myositis, deconditioning and obesity. Dr. Rucker opined that plaintiff's leg pain was due to diabetic neuropathy. Dr. Rucker also opined that plaintiff had uncontrolled diabetes mellitus; coronary artery disease, status post three-stent placement; and right shoulder pain due to osteoarthritis, trauma and tendinitis/bursitis syndrome. (Tr. 334-37, 342-43.) With respect to work-related limitations, Dr. Rucker opined that plaintiff had no limitations with hearing or speaking, handling objects, or with short-distance walking. Dr. Rucker opined that plaintiff would have difficulty bending, stooping, repetitively lifting and carrying over twenty pounds, and raising her arm above her head due to the condition of her right shoulder. (Tr. 341.)

On March 26, 2009, Lindsey Struemph, a single decisionmaker with disability determinations, completed a Physical Residual Functional Capacity Assessment wherein she opined that plaintiff could occasionally lift and carry twenty pounds;

frequently lift and carry ten pounds; stand and/or walk about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and was limited to occasional overhead lifting with her upper extremities, bilaterally. Ms. Struemph opined that plaintiff could never climb ladders, ropes or scaffolds; but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. Ms. Struemph opined that plaintiff was limited in reaching in all directions, but otherwise had no manipulative limitations. Ms. Struemph opined that plaintiff had no visual or communicative limitations. Ms. Struemph opined that plaintiff should avoid concentrated exposure to extreme cold; vibration; and fumes, odors, dust, gases, and poor ventilation, but otherwise had no environmental limitations. (Tr. 345-51.)

Plaintiff returned to Pike Medical Clinic on April 3, 2009, and complained of swelling in her legs that was not improving. Plaintiff complained of having the condition for two years. Plaintiff also complained of pain in her right shoulder. Plaintiff's medications were noted to include Plavix, insulin, Atenolol, Lovastatin, Lisinipril, Levothyroxine, and HCTZ.[22] Physical examination showed edema of the lower extremities,

---

[22]HCTZ (Hydrochlorothiazide) is used to treat high blood pressure and fluid retention caused by various conditions. Medline Plus (last revised May 15, 2012)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a682571.html>.

bilaterally, with no calf pain.  Plaintiff had decreased range of motion about the right shoulder and decreased strength.  Plaintiff was diagnosed with peripheral edema and an increase in HCTZ was discussed.  Plaintiff was also diagnosed with right shoulder pain, likely chronic tear.  (Tr. 384.)

An x-ray of the right shoulder taken April 3, 2009, showed no significant bony abnormalities.  (Tr. 387.)

Plaintiff returned to Pike Medical Clinic on April 8, 2009, and complained of bilateral knee pain and bilateral shoulder pain.  (Tr. 383.)  In a letter to plaintiff's counsel that same date, Dr. Phillip W. Pitney from Pike Medical Clinic summarized plaintiff's examination as well as his opinion as to plaintiff's conditions:

> [T]his lady has significant brittle diabetes mellitus with poor control but has multiple physical and psychological problems which include a depressive disorder related to her multiple medical problems. . . .
>
> This patient does have a significant impairment of the range of motion of the right shoulder and she is right handed which would probably prevent her from doing anything as far as a physical capacity related to the use of the arm.  I suspect that she has an anterior capsule tear of the shoulder.  We do not have an MRI to support this diagnosis. Routine x-rays are negative but the patient has significant pain and discomfort on range of motion and is unable to adduct the arm away from the side of the body more than 10-15 degrees.

> She has diffuse weakness . . . . She has
> chronic pain involving the lower extremities.
> A lot of Mary's problems may be psychogenic in
> nature and I think this needs further
> evaluation and treatment.

(Tr. 359.)

Dr. Pitney also noted in this letter that plaintiff had an upcoming appointment with a psychiatrist. (Tr. 359.)

In a physical assessment completed that same date, April 8, 2009, Dr. Pitney reported that plaintiff's diagnoses were non-controlled diabetes and tear of the right rotator cuff. Dr. Pitney noted plaintiff's prognosis to be guarded. Dr. Pitney noted plaintiff's symptoms to include weakness, pain, depression, and vertigo. Dr. Pitney opined that plaintiff could sit, stand and walk for a total of two hours in an eight-hour workday; and that plaintiff would require an at will sit-stand position at work, would need periods of walking around, and would need to elevate her legs while sitting. Dr. Pitney also opined that plaintiff would need to take unscheduled breaks during an eight-hour workday. Dr. Pitney opined that plaintiff could occasionally lift and carry less than ten pounds; rarely lift and carry ten to twenty pounds; and could never lift and carry fifty pounds. Dr. Pitney opined that plaintiff could occasionally twist, stoop, bend, and climb stairs; could rarely crouch; and could never climb ladders. Dr. Pitney opined that plaintiff could occasionally reach in all directions

and handle objects, and could frequently engage in fine manipulation and fingering. Dr. Pitney opined that emotional factors contributed to the severity of plaintiff's symptoms and that plaintiff's depressive disorder affected the level of her pain. Dr. Pitney opined that plaintiff's pain frequently interfered with her attention and concentration and that plaintiff was moderately limited in her ability to deal with work stress. Dr. Pitney opined that plaintiff's impairments did not likely cause "good" days or "bad" days, and that her impairments would cause her to be absent from work less than once a month. (Tr. 360-61.)

On April 21, 2009, plaintiff underwent a consultative psychological evaluation for disability determinations. Plaintiff reported having panic attacks and suicidal thoughts in the past, although none currently. Plaintiff also reported having paranoid thinking in that she sometimes feels as though someone is behind her. Plaintiff also reported anxiety about leaving her home. Plaintiff reported taking antidepressant medication in the past and that she was currently prescribed BuSpar.[23] Plaintiff reported not taking her medication daily and felt as though the medication was not helping her depression. Plaintiff reported having poor memory and difficulty sleeping. Mental status examination showed

_____

[23]BuSpar is used to treat anxiety disorders or for the short-term treatment of symptoms of anxiety. Medline Plus (last revised Apr. 15, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a688005.html>.

plaintiff to have appropriate facial expressions and eye contact and to be able to relate well. Dr. Kim A. Dempsey noted plaintiff's mood to be severely depressed and that she appeared to be in acute distress. Dr. Dempsey noted plaintiff's speech to be clear, logical, coherent, relevant, and goal-directed. No loose or bizarre thought associations were present. Plaintiff was oriented times four. Plaintiff reported recent feelings of hopelessness but had no current suicidal thoughts. Dr. Dempsey noted some paranoid delusional thinking given plaintiff's feeling that someone was behind her. Dr. Dempsey noted plaintiff's thinking to be intact but with problematic memory functions. Mental control was impaired, and Dr. Dempsey opined that plaintiff was in the low average range of intellectual functioning. Plaintiff was able to perform simple math functioning, but had difficulty with combined functions. Dr. Dempsey noted plaintiff's daily activities to be restricted by major depressive symptoms, with impairment in plaintiff's interests and personal habits. It was noted that plaintiff could understand and follow simple instructions but had difficulty with delayed memory. Dr. Dempsey opined that plaintiff appeared to have difficulty tolerating normal external stress and handling vocational pressures due to mood symptoms. Dr. Dempsey concluded that plaintiff appeared to be experiencing a severe depressive process, with possible psychotic features, which interfered with her ability to maintain employment. Dr. Dempsey

diagnosed plaintiff with major depressive disorder, recurrent, severe; and assigned plaintiff a Global Assessment of Functioning (GAF) score of 45.[24]   (Tr. 374-77.)   Dr. Dempsey completed a Disability Evaluation that same date in which she opined that plaintiff had a mental and/or physical disability which prevented her from engaging in employment or gainful activity.  Dr. Dempsey reported that plaintiff's major depressive symptoms with possible psychotic features would likely interfere with occupational functioning.  (Tr. 378-79.)

Plaintiff returned to Pike Medical Clinic on April 30, 2009, and complained of chest wall pain, back and arm pain, and vertigo.  It was noted that plaintiff had decreased range of motion.  Medication was prescribed.  (Tr. 382.)

On May 5, 2009, plaintiff reported to Pike Medical Clinic that she increased her dosage of HCTZ due to swelling in her legs. Plaintiff also complained of right shoulder pain.  Plaintiff had decreased range of motion about the right shoulder.  Plaintiff was diagnosed with edema and leg pain, as well as right shoulder pain. (Tr. 381.)

---

[24]A GAF (Global Assessment of Functioning) score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness."  Diagnostic & Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000).  A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

On June 30, 2009, and September 8, 2009, plaintiff visited Dr. Jessica Downs of Advanced Eye Care with complaints of worsening vision with associated pain behind the eyes. Dr. Downs opined that such symptoms evidenced mild background diabetic retinopathy. Continued monitoring of the condition was recommended as well as consultation with a retinal specialist. (Tr. 362-72.)

## IV.  The ALJ's Decision

The ALJ found that plaintiff last met the insured status requirements of the Social Security Act on June 30, 2009. The ALJ found that plaintiff had not engaged in substantial gainful activity since the amended onset date of disability, October 1, 2008, through the date last insured, June 30, 2009. The ALJ found plaintiff's insulin dependent diabetes mellitus, obesity, right shoulder bursitis, and major depressive disorder to constitute severe impairments but that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subpt. P, App'x 1. The ALJ determined plaintiff to have the residual functional capacity (RFC) to perform light work, with additional limitations that plaintiff perform only unskilled tasks; cannot climb ladders; can only occasionally balance, stoop, kneel, crouch, and/or crawl; cannot reach overhead; must avoid vibrations; and must be able to sit or stand at will. The ALJ found plaintiff unable to perform any of her past relevant work. Considering plaintiff's age, education,

work experience, and RFC, the ALJ determined there to be other work existing in significant numbers in the national economy that plaintiff could perform, such as cashier, assembly worker and hand packager, consistent with the testimony provided by the vocational expert.  The ALJ thus determined plaintiff not to be disabled at any time from October 1, 2008, through the date last insured, June 30, 2009.  (Tr. 13-22.)

## V.  Discussion

To be eligible for Social Security Disability Insurance Benefits under the Social Security Act, plaintiff must prove that she is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. <u>See</u> 20 C.F.R. § 404.1520; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002). Substantial

evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." <u>Coleman v. Astrue</u>, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." <u>Id.</u> (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Here, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff contends that the ALJ failed to properly evaluate the medical opinions of record. Plaintiff also claims that the hypothetical question posed to the vocational expert, the answer to which the ALJ relied upon in finding plaintiff not to be disabled, failed to include all of plaintiff's impairments as determined by the ALJ. Finally, plaintiff contends that the ALJ's RFC determination is not supported by substantial evidence.

A.    Commissioner's Motion to Reverse and Remand

As an initial matter, the undersigned notes that the

Commissioner has moved to reverse and remand this matter so that, upon remand, the Appeals Council can instruct an ALJ to obtain supplemental testimony from a vocational expert in response to a hypothetical question that accurately reflects plaintiff's RFC. (See Doc. #15.) Specifically, the Commissioner notes that the ALJ here failed to incorporate into the hypothetical her findings that plaintiff required a job that allowed her to sit and stand at will, and that plaintiff could not reach overhead. Plaintiff does not dispute this basis upon which to remand the matter to the Commissioner, and a review of the issue shows the Commissioner's contention to be well taken. "Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision." Hinchey v. Sullivan, 29 F.3d 428, 432 (8th Cir. 1994); see also Renstrom v. Astrue, 680 F.3d 1057, 1067 (8th Cir. 2012).

Plaintiff argues, however, that in addition to the error identified by the Commissioner in his Motion to Reverse and Remand, the Commissioner committed several other errors in his determination to deny plaintiff's claim for disability benefits. Plaintiff opposes the limited basis upon which the Commissioner seeks remand and contends that the Commissioner's decision should likewise be reversed and remanded on the other grounds raised by plaintiff in this cause, as set out above. The Commissioner opposes this position.

To remand for the limited purpose as requested by the Commissioner would leave unresolved questions properly raised by plaintiff in this appeal of the Commissioner's adverse decision. Plaintiff raises separate claims that the ALJ's RFC determination is flawed inasmuch as the ALJ failed to properly credit the medical opinion evidence of record and, further, because the determination itself is not supported by medical evidence. As such, to remand for the sole purpose of eliciting vocational expert testimony upon the existing RFC assessment would ignore the plaintiff's challenge to the assessment itself.

Piecemeal litigation is to be avoided. Curtiss-Wright Corp. v. General Elec. Co., 446 U.S. 1, 8 (1980). E.g., Murrell v. Shalala, 43 F.3d 1388, 1389 (10th Cir. 1994) (thorough resolution of social security case *once* benefits the courts by avoiding piecemeal appeals and benefits the litigants by sparing them "the protracted delays that result when a case drags on incrementally, bouncing back-and-forth between administrative (re)determinations and judicial review thereof."). To remand the instant matter to the Commissioner on the sole basis urged by defendant would leave unresolved claims of error properly raised by plaintiff in this appeal seeking judicial review of the Commissioner's final decision. In the interest of the parties, and for the sake of judicial economy, the undersigned determines it to be most appropriate for plaintiff's claims to be resolved at one step of

the administrative/judicial process instead of risking protracted delays in the incremental determination of individual claims.

Accordingly, the undersigned will proceed to determine the remainder of plaintiff's claims as raised in this cause of action.

B.   Medical Opinion Evidence

Plaintiff claims that the ALJ failed to properly evaluate the medical opinion evidence of record, specifically challenging the ALJ's analysis regarding the opinions of treating physician Dr. Pitney and consulting psychologist Dr. Dempsey.

In evaluating opinion evidence, the Regulations require the ALJ to explain in the decision the weight given to any opinions from treating sources, non-treating sources and non-examining sources.   See 20 C.F.R. § 404.1527(f)(2)(ii).   The Regulations require that more weight be given to the opinions of treating physicians than other sources.   20 C.F.R. § 404.1527(d)(2).   A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.   20 C.F.R. § 404.1527(d)(2); see also Forehand v. Barnhart, 364 F.3d 984, 986 (8th Cir. 2004). This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the
> medical professionals most able to provide a
> detailed, longitudinal picture of [a
> claimant's] medical impairment(s) and may
> bring a unique perspective to the medical
> evidence that cannot be obtained from the
> objective medical findings alone or from
> reports of individual examinations, such as
> consultative examinations or brief
> hospitalizations.

20 C.F.R. § 404.1527(d)(2).

As such, evidence received from a treating physician is generally accorded great weight with deference given to such evidence over that from consulting or non-examining physicians. See Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992); Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1991).

Opinions of treating physicians do not automatically control in determining disability, however, inasmuch as the Commissioner is required to evaluate the record as a whole. Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007); Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004). The ALJ may discount or disregard such opinions if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). In addition, inconsistency with other substantial evidence alone is sufficient to discount a treating physician's opinion. Goff v. Barnhart, 421 F.3d 785, 790-91 (8th Cir. 2005).

When a treating physician's opinion is not given

controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion. 20 C.F.R. § 404.1527(d)(2). Such factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty. Id. The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." Id.

Against this backdrop, the undersigned turns to plaintiff's claims that the ALJ erred in her analyses and the weight accorded to the opinions of Drs. Pitney and Dempsey.

1. *Dr. Pitney*

In her written decision, the ALJ considered Dr. Pitney's April 2009 letter and assessment and determined to accord varied, but less than controlling, weight to the opinions expressed therein:

> Dr. Pitney's opinion the claimant's problems were primarily psychogenic was given credit. Dr. Pitney went on to indicate his opinion of the claimant's residual capacity and the undersigned gave this some weight also where it could be determined. He did not indicate[] what the claimant was able to do for 2 hours of an 8 hour workday and that was not very helpful to the undersigned however the rest

was consistent with the rest of the record and given some weight. His opinion about her depressive disorder was given little weight since he was not a mental health practitioner. He indicated she would be able to work with some restrictions.

(Tr. 20.) (Internal citations to record omitted.)

Plaintiff argues that the ALJ failed to properly undergo the required analysis necessary to determine the weight given to the opinion of plaintiff's treating physician, and failed to seek clarification from Dr. Pitney on those opinions she found to be unclear.

Assuming *arguendo* that Dr. Pitney was indeed plaintiff's treating physician,[25] the ALJ properly determined not to accord controlling weight to Dr. Pitney's opinions and, further, properly determined to accord some weight to those opinions which were supported by other substantial evidence on the record. A review of the ALJ's written decision shows the ALJ to have noted that no medical imaging of plaintiff's shoulder condition was obtained to support the degree of limitation as opined by Dr. Pitney, and indeed that x-rays of the shoulder yielded normal results. A

_____

[25]In his assessment, Dr. Pitney indicated that he had treated plaintiff since 1985. (Tr. 360.) While a review of the medical evidence of record shows plaintiff to have been continually treated by Pike Medical Clinic, of which Dr. Pitney was a member, a review of the individual treatment notes shows plaintiff to have been examined and treated by a number of physicians at the Clinic. The only record(s) definitively showing Dr. Pitney's involvement in plaintiff's treatment are those from April 8, 2009, the date upon which Dr. Pitney completed the assessment.

physician's opinion is not entitled to receive substantial deference where it is not supported by any objective diagnostic testing. Robson v. Astrue, 526 F.3d 389, 393 (8th Cir. 2008); see also Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (treating physician's report failed to cite to objective medical test or diagnostic data to support limitations). The ALJ also noted that one month prior to Dr. Pitney's written assessment, plaintiff exhibited full grip strength, mildly limited range of motion and mildly limited arm strength during a consultative examination. See Chamberlain, 47 F.3d at 1494 (treating physician's conclusory opinion came only weeks after consulting physician's range of motion examination, the results of which differed significantly). The ALJ also noted that plaintiff's visits to a physician were intermittent; that she was noncompliant with her treatment regimen, including medication and diet; and that, although plaintiff had poorly controlled diabetes, there was no significant evidence of neuropathy, and testing showed no sensory loss. See Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) (claimant's noncompliance with medications and diet can be considered in determining whether to give treating physician's opinion controlling weight when opinion does not take such noncompliance into account). Finally, the ALJ's determination to give little weight to Dr. Pitney's opinion regarding plaintiff's depressive disorder on account of Dr. Pitney not being a mental

health professional was not error. An ALJ does not err in determining to accord less weight to a treating physician's opinion in circumstances where such opinion appears to be outside the scope of the physician's expertise. See Loving v. Department of Health & Human Servs., 16 F.3d 967, 971 (8th Cir. 1994); see also Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000).

To be entitled to substantial or controlling weight, a medical opinion must be well-supported by medical evidence. Martise v. Astrue, 641 F.3d 909, 926 (8th Cir. 2011). Inasmuch as the significant limitations described by Dr. Pitney were not so supported, the ALJ did not err in according his opinion less than substantial or controlling weight. Nevertheless, given the serious functional limitations found by the ALJ in determining plaintiff's physical RFC, it is apparent that the ALJ did not entirely reject Dr. Pitney's opinion, and indeed credited his opinion to the extent it was consistent with other substantial evidence of record. See id. This was not error.

2. *Recontacting Dr. Pitney*

Plaintiff also contends that the ALJ should have recontacted Dr. Pitney to clarify the sit/stand restrictions inasmuch as the ALJ found such opinion to be unclear. An ALJ is not required to seek additional or clarifying information from a treating physician unless a crucial issue is undeveloped. Goff, 421 F.3d at 791 (citing Stormo v. Barnhart, 377 F.3d 801, 806 (8th

Cir. 2004)).  While the Regulations provide that the ALJ should recontact a treating physician in some circumstances, "that requirement is not universal."  Hacker v. Barnhart, 459 F.3d 934, 938 (8th Cir. 2006).  Instead, the Regulations provide that the ALJ should recontact medical sources "[w]hen the evidence [received] from [the claimant's] treating physician or psychologist or other medical source is inadequate" for the ALJ to determine whether the claimant is disabled.  20 C.F.R. § 404.1512(e).  There is no need to recontact a treating physician where the ALJ can determine from the record whether the claimant is disabled.  Hacker, 459 F.3d at 938.  Here, there was sufficient medical evidence in the record from which the ALJ could determine plaintiff's physical RFC.  Indeed, in her RFC determination, the ALJ found that plaintiff required a job which afforded her the option to sit and stand at will.  Such restriction demonstrates the ALJ's acknowledgment of plaintiff's significant functional limitation in her ability to sit and stand at work.  See Martise, 641 F.3d at 926.  The ALJ therefore did not err in failing to recontact plaintiff's treating physician to obtain additional or clarifying information relating thereto.

  3. *Dr. Dempsey*

   In her written decision, the ALJ determined to accord consulting psychologist Dr. Dempsey's April 2009 opinion "some credit" to the extent she opined that plaintiff could continue to

perform unskilled work.  (Tr. 20.)  Plaintiff claims that the ALJ
failed to consider the remainder of Dr. Demspey's opinion, however,
including a GAF score of 45; and that proper consideration of such
opinion would have resulted in additional mental limitations in
plaintiff's RFC.

        a.    Weight Given to Opinion

        In her decision, the ALJ summarized Dr. Dempsey's
evaluation of plaintiff, specifically noting that plaintiff's
speech was logical and coherent, and that plaintiff was oriented in
all spheres; that plaintiff's quality of thinking appeared to be
intact with math functions mostly intact; that despite plaintiff's
impairment in interests and personal habit, she nevertheless
displayed an ability to understand and follow simple instructions
and could manage her own funds.  (Tr. 19-20.)  The ALJ also
summarized Dr. Demspey's observations regarding plaintiff's delayed
memory problems, low average intellect, and difficulty with
tolerating vocational pressures. (<u>Id.</u>)  While the ALJ acknowledged
Dr. Dempsey's opinion that plaintiff's mental impairment would
affect her ability to maintain employment, she nevertheless found
Dr. Dempsey's evaluation *in toto* to be consistent with a finding
that plaintiff could perform unskilled work.  (<u>Id.</u>)  This finding
is supported by substantial evidence on the record as a whole.

        To the extent plaintiff argues that the ALJ erred by
failing to consider the GAF score of 45 assigned by Dr. Dempsey,

the undersigned notes that one GAF score does not constitute substantial evidence upon which an ALJ may base an RFC determination. Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010). This is especially true here where the one GAF score was assigned by a consulting psychologist who based her opinion on a one-time evaluation which consisted of a patient interview without diagnostic testing. See Wildman, 596 F.3d at 967 (not error to discount consulting psychologist's opinion when based largely on claimant's subjective complaints rather than objective testing); Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (same). A review of the ALJ's decision here shows the ALJ to have considered the entirety of Dr. Dempsey's findings and, when reviewed with the other evidence of record, determined to credit such findings to the extent they were consistent with other evidence demonstrating that plaintiff could perform unskilled work. The ALJ's failure to credit all of Dr. Dempsey's findings, or to accord her opinion greater weight, was not error. Kirby, 500 F.3d at 709.

b.  Mental RFC

Such does not end the inquiry, however. The record supports the ALJ's finding that plaintiff was limited to unskilled work,[26] and the ALJ properly included such general limitation in plaintiff's RFC. However, despite finding plaintiff's major

---

[26]Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. 20 C.F.R. § 404.1568(a).

depressive disorder to constitute a severe impairment (Tr. 15); crediting Dr. Dempsey's finding that plaintiff suffered from delayed memory problems (Tr. 20); appearing to credit plaintiff's testimony regarding her difficulty remembering ingredients while cooking, remembering items needed at the grocery store, and understanding what she reads in a newspaper (Tr. 17); and crediting Dr. Pitney's finding that many of plaintiff's problems were psychogenic in nature (Tr. 20), the ALJ failed to include any mental limitations in plaintiff's RFC. In light of the ALJ's finding that plaintiff suffered a severe mental impairment and specifically, major depressive disorder, coupled with her credited findings of plaintiff's memory impairment and psychogenic problems, the ALJ's general RFC finding that plaintiff could perform unskilled work without discussion as to how plaintiff's mental limitations affected her RFC, was error. Cf. <u>Vincent v. Apfel</u>, 264 F.3d 767, 769-70 (8th Cir. 2001).

C.  <u>Vocational Expert Testimony</u>

As noted above, the Commissioner has moved to remand the cause so that a proper hypothetical question may be posed to a vocational expert, with such hypothetical to include the physical limitations that plaintiff could not reach overhead and required a job at which she could sit and stand at will. For the reasons stated <u>supra</u> at Section V.B.3.b, the hypothetical question should also include plaintiff's credited mental limitations, including

plaintiff's major depressive disorder which the ALJ found to be severe. When an ALJ fails to include the consequences of a severe mental impairment in a hypothetical posed to a vocational expert, the vocational expert's testimony does not constitute substantial evidence. Hunt v. Massanari, 250 F.3d 622, 625-26 (8th Cir. 2001) (ALJ erred by including only physical limitations in hypothetical question when plaintiff also had mental impairments including depression, borderline intellectual functioning, memory loss, bad nerves, and emotional problems). Cf. Brock v. Astrue, 674 F.3d 1062 (2012) (where ALJ determines claimant to suffer from a severe mental impairment, vocational expert must be consulted in determining whether claimant had RFC to perform other work); Hillier v. Social Security Admin., 486 F.3d 359, 365-66 (8th Cir. 2007) (practical consequences of a claimant's mental impairment must be presented to vocational expert for consideration).

D.    Substantial Evidence Supporting RFC Determination

          Finally, plaintiff contends that the ALJ's RFC determination is not supported by medical evidence in the record and therefore is not supported by substantial evidence on the record as a whole.

          For the reasons stated supra at Section V.B.3.b, plaintiff's contention regarding the ALJ's assessment of plaintiff's mental RFC is well taken. With respect to plaintiff's contention regarding the ALJ's assessment of plaintiff's physical

RFC, the undersigned notes that the Commissioner agrees and requests that the matter be remanded for further consideration of plaintiff's physical RFC. (See Deft.'s Brief in Resp., Doc. #18, p. 12.) Upon remand, the Commissioner should be mindful of the requirement that some medical evidence must support the ALJ's RFC determination, Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002); Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer v. Apfel, 245 F.3d 700, 703-04 (8th Cir. 2001); and that an RFC checklist completed by a non-treating, non-examining physician who has merely reviewed reports is not *medical* evidence as to how a claimant's impairments affect her current ability to function and thus cannot alone constitute substantial evidence to support an ALJ's RFC assessment. See Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000); Nunn v. Heckler, 732 F.2d 645, 649 (8th Cir. 1984).

E.    Consolidation of Claims for Benefits

In his Motion to Reverse and Remand, defendant Commissioner avers that upon remand, plaintiff's subsequent claim for benefits will be consolidated with the instant claim and that a decision will be rendered on both claims. Plaintiff opposes consolidation of the claims before the Commissioner upon remand.

Section 404.952 of Title 20 of the Code of Federal Regulations sets out the manner and method by which claims may be consolidated before an ALJ. The information presently before the Court is insufficient upon which to determine whether plaintiff's

separate claims for benefits are appropriate for consolidation before an ALJ upon remand of the instant cause of action. Nor has either party provided the Court with authority, and the undersigned is aware of none, which permits a district court to make such a preemptive administrative determination. See National Park Hospitality Ass'n v. Department of the Interior, 538 U.S. 803, 807-08 (2003) (doctrine of ripeness designed to "protect . . . agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."). The Court should therefore decline to do so.

## VI.  Conclusion

The Commissioner acknowledges that the decision to deny plaintiff's claim for disability benefits is not supported by substantial evidence inasmuch as the hypothetical question posed to the vocational expert, the answer to which the ALJ relied upon in finding plaintiff not to be disabled, failed to incorporate the ALJ's RFC findings that plaintiff required a job that allowed her to sit and stand at will, and that plaintiff could not reach overhead. The Commissioner likewise agrees that the ALJ's physical RFC determination is not supported by substantial evidence. For the reasons set out above, the ALJ's mental RFC determination is likewise not supported by substantial evidence. Accordingly, the Commissioner's decision is not supported by substantial evidence on

the record as a whole and this cause should be remanded for further consideration.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the Commissioner's Motion to Reverse and Remand (Doc. #15) be granted to the extent it requests that this cause be remanded to the Commissioner for the purpose of obtaining supplemental testimony from a vocational expert in response to a hypothetical question that accurately reflects plaintiff's RFC. To the extent defendant contends that no other ground provides a basis upon which to remand this cause to the Commissioner, such contention should be denied.

**IT IS FURTHER RECOMMENDED** that the decision of the Commissioner be reversed and that this matter be remanded to the Commissioner for further proceedings consistent with the findings herein.

The parties are advised that any written objections to this Report and Recommendation shall be filed not later than **August 6, 2012.** Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

_Frederick R. Buckles_
_____
UNITED STATES MAGISTRATE JUDGE

Dated this 23rd day of July, 2012.